**H.W. CARTER & SONS, INC., and American Marketing Enterprises, Inc., Plaintiffs,**

v.

**The WILLIAM CARTER CO., Defendant.**

**No. 95 Civ. 1274 (DC).**

United States District Court, S.D. New York.

Jan. 25, 1996.

James B. Swire, Sandra Edelman, Dorsey & Whitney P.L.L.P., New York City, for Plaintiffs.

Kenneth A. Plevan, Paul A. Ramundo, Bruce J. Goldner, Skadden, Arps, Slate, Meagher & Flom, New York City, for Defendant.

## OPINION

CHIN, District Judge.

In 1859, Henry Wood Carter started the company now known as H.W. Carter & Sons, Inc. ("H.W. Carter") in Lebanon, New Hampshire, selling merchandise out of horse-drawn wagons. Just six years later, William Carter founded the company now known as the William Carter Company ("Wm. Carter") in Highlandsville, Massachusetts, manufacturing cardigan jackets in the kitchen of his home.

Both companies prospered and eventually started selling children's clothing using the name CARTER'S. For over 130 years, the two Carter companies enjoyed a relatively peaceful co-existence, with only occasional discussions about their competing use of the CARTER'S name.

In 1994, H.W. Carter granted a license to American Marketing Enterprises, Inc. ("AME") to use its trademark, CARTER'S WATCH THE WEAR, in the sale of certain children's apparel. In early 1995, AME launched a new line of boy's clothing under the mark CARTER'S WATCH THE WEAR. Shortly thereafter, Wm. Carter wrote to plaintiffs, objecting to the use of the CARTER'S name in the "launch" of the new line of clothing. Indeed, Wm. Carter requested that plaintiff's withdraw the new line of clothing and eliminate the word CARTER'S from the mark CARTER'S WATCH THE WEAR.

This action followed. Plaintiffs H.W. Carter and AME sued for a declaration that their use of the mark CARTER'S WATCH THE WEAR did not infringe upon Wm. Carter's trademarks, and defendant Wm. Carter immediately counterclaimed, alleging that plaintiffs' use of the mark CARTER'S WATCH THE WEAR infringed on its registered trademark CARTER'S. Wm. Carter then sent a letter to several dozen customers, including a number of large retailing companies, accusing plaintiffs of trademark infringement. Plaintiffs responded by filing an amended complaint adding claims that Wm. Carter's letter to the trade contained false and misleading statements in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(2) (1988). Both sides have also asserted unfair competition claims under New York State common law.

This case was tried to the Court in June and July 1995. Because I find that H.W. Carter is the senior user of the CARTER'S name in the sale of children's clothing, judgment will be entered in favor of plaintiffs on their trademark claims. Judgment will be entered in favor of defendant, however, on plaintiffs' claims based on the letter to the trade. Although I agree that the letter was misleading in certain respects, the misstatements were not material and do not rise to the level of a violation of the Lanham Act. Pursuant to Fed.R.Civ.P. 52, the following are my findings of fact and conclusions of law.

## FINDINGS OF FACT

### A. H.W. Carter

H.W. Carter has been in business since 1859. It began manufacturing overalls in 1870, initially selling them in the New England area. In 1883, it began using the trademark CARTER'S RAILROAD OVERALLS. It registered this mark in 1906 for use in the sale of overalls. The registration was not restricted as to size, gender, channel of trade, or product use, except that the "goods" upon which the mark was to be used were "overalls." (PX 287). After two renewals, the registration expired in 1966.

By 1890, H.W. Carter had expanded its product line beyond overalls to include coats, jumpers and shirts. (PX 5a). It also started selling boys' overalls and eventually sold other children's clothing as well. A 1926 price list, for example, shows that H.W. Carter was selling "juvenile overalls" for children ages 4, 6, 8, 10, 12, 14, and 16 as well as "Youth's Dark Mode Khaki Pants." (PX 6). Similarly, a 1928 price list featured boys' jackets, ski coats, and sport coats. (PX 7). A 1939 H.W. Carter price list offered boys' parkajacks, mackinaw coats, snow suits, snow pants, poplin suits, and jackets, starting in size 2. (PX 8).

All three price lists prominently featured the mark CARTER'S. (PX 6, 7, 8). Indeed, a 1926 trademark registration represented that H.W. Carter had been "continuously" using the mark CARTER'S in the sale of, among other things, wool mackinaw coats and sports jackets for men, boys, and women since 1915. (PX 286). This 1926 registration expired in 1946.

In 1929, H.W. Carter acquired The Watch the Wear Overall Co. of Keene, New Hampshire and with it the mark WATCH THE WEAR. In 1930, H.W. Carter registered the trademark CARTER'S WATCH THE WEAR with a logo featuring drawings of a steam locomotive and a worker shining a customer's shoes. (PX 202). The mark was

registered for overalls, pants, coats, jackets, and aprons, but it was not restricted as to size, gender, channel of trade, or product use. In 1955, the registration was amended to eliminate the drawings, leaving only the words CARTER'S WATCH THE WEAR. (*Id.*). The registration was renewed in 1970 and again in 1990 and remains valid today. (PX 288; Tr. at 454).[1]

In 1938, H.W. Carter registered the mark CARTER'S EASTERN SLOPES for "sports wear, such as jackets, coats, vests, shirts, snow suits, and pants . . . , for men, women, and children." (PX 292). This registration expired in 1958.

Hence, H.W. Carter started selling children's clothing as early as 1890 and continued to do so throughout the 1900's, not only in the Northeast, but in other regions of the country as well. (*See, e.g.,* Follensbee Dep. at 5–9, 21; Tr. at 49–51, 58–61, 100–14; Penfield Dep. at 8–12, 23–24, 33–35, 47, 58–61, 68–69; PX 2, 6, 7, 8, 10, 14, 47–72). For the most part, H.W. Carter's sales of children's clothing consisted of sales of outerwear and "workwear," such as overalls, jeans, and other denim and flannel products that carpenters and other workers would wear. (*See, e.g.,* PX 12, 13, 16, 17, 18, 19, 20, 21, 36, 85, 86, 88). To a lesser extent, H.W. Carter sold other types of children's clothing over the years as well, including shortalls, skirtalls, vests, shirts, tee-shirts, sweatshirts, blouses, jumpers, and infantwear. (*See, e.g.,* PX 22, 23, 28, 89, 110; Tr. at 105–07, 130–32, 138, 147, 221–22). Nonetheless, at least since the late 1980's, H.W. Carter has sought to promote itself, through use of the CARTER'S WATCH THE WEAR label, as a jeanwear company specializing in workwear and clothing with a more "rugged" look and feel. (Tr. at 181–82).

In recent years, workwear, including "vintage" clothing such as railroad and carpenter coats, has become increasingly fashionable. As a result, H.W. Carter itself became the subject of favorable publicity. (Tr. at 163, 170–71, 175–81; PX 152 (photo featuring children wearing H.W. Carter overalls), 157

(photo featuring boy wearing H.W. Carter overalls), 191 ("Manly fashions—the kind a bluecollar worker might wear to shimmy down a sewer, grease an axle, harvest the grain or down a cold brew after a hard day's work—are the rage."), 192 (the "workwear trend"), 332 (photo spread featuring glamorous model wearing H.W. Carter apron dress and jeans); *see also* PX 3, 4). To take advantage of this trend, H.W. Carter reinstituted the use of a steam locomotive in its logo and it has sought to emphasize its long history in workwear. (*See, e.g.,* PX 150, 151, 152; *see also* DX F–1, F–2).

Over the years, the ownership of H.W. Carter changed several times.[2] In 1987, H.W. Carter's then-parent corporation went into bankruptcy. Shortly thereafter, Norman Moskowitz purchased H.W. Carter's physical assets (including inventory and work in process) and acquired its trademarks as well, including the mark CARTER'S WATCH THE WEAR. Moskowitz continued to use the H.W. Carter name and the mark CARTER'S WATCH THE WEAR in the sale of children's apparel. (*See, e.g.,* Tr. at 117–21, 145–47, 163). H.W. Carter's gross sales were $3.9 million in 1993 and $4.5 million in 1994. (Tr. at 184).

## B. *Wm. Carter*

Wm. Carter has been in business since 1865. By the late 1800's, Wm. Carter was manufacturing underwear, union suits, and mittens. It soon became well known as a manufacturer of branded underwear and other undergarments. In 1907, it registered the trademark CARTER'S for "knitted union suits, [corset covers,] vests, drawers, [abdominal bands, shirt bands]," (DX A–1) (brackets in original), also described as "certain underclothing." (PX 281 at WC 0001783–86). This registration has been renewed four times and remains in force today. (PX 282; Tr. at 458).

In 1922, Wm. Carter was issued a second registration for the trademark CARTER'S, this time covering:

---

1. References to "Tr." are to pages of the trial transcript.

2. For ease of reference, I will refer to plaintiff H.W. Carter & Sons, Inc. and its various predecessors simply as H.W. Carter.

undergarments, comprising drawers, shirts for women, and for children; athletic suits, woven athletic shirts, woven athletic drawers, woven athletic trunks for boys; woven camisoles, bloomers, for girls, and knitted shirts for children.

(DX B–1). This 1922 registration has been renewed three times and is still valid today. (Tr. at 461).

In 1979, Wm. Carter acquired yet another registration for the mark CARTER'S, specifically covering:

clothing for infants and children—namely, underwear, swimwear, shirts, blouses, dresses, skirts, pants, slacks, shorts, coveralls, creepers, overalls, jackets, vests, sleepwear, bunting, bibs, booties, bonnets, and slippers....

(DX Q–1). The 1979 registration is still valid today.

Over the years Wm. Carter had great success as its sales grew substantially. In part because of its pioneering efforts in advertising, Wm. Carter became well known not just for underwear but also for infantwear and layettes. Its "heritage" was built on "the baby business" (Rowan Dep. at 25), although starting in the mid–1900's it also achieved some success in playwear and children's apparel in general. (See PX 252; Tr. at 806–07). It did not start selling any children's playwear until the 1950's. (Tr. at 803; see id. at 799).[3] By the mid–1960's, playwear accounted for roughly one-third of Wm. Carter's business, with underwear and layette accounting for another one-third and sleep-

wear the remaining one-third. (Tr. at 804). Wm. Carter did not start selling any denim items until the 1970's. (Tr. at 820–21).

Wm. Carter's nationwide sales of children's clothing with the CARTER'S mark have been continuous and substantial for many years. As a consequence, its mark CARTER'S became and remains extremely strong.[4]

### C. Wm. Carter's Knowledge of H.W. Carter's Use of the CARTER'S Name

Although both Carter companies used the CARTER'S name in selling children's clothing, and although Wm. Carter employees were aware of H.W. Carter's existence over the years,[5] no litigation was filed until the present suit. The issue did arise, however, on a number of prior occasions.

In August 1964, Wm. Carter's then-attorneys commissioned a search of the records of the United States Patent and Trademark Office (the "PTO"), which showed H.W. Carter's 1930 registration of the mark CARTER'S WATCH THE WEAR. (PX 108). The CARTER'S WATCH THE WEAR mark was also brought to Wm. Carter's attention in November 1964 in proceedings brought by Wm. Carter against registration of the mark PEGGY CARTER for use in children's apparel. (PX 106, 109).

Donald Penfield, H.W. Carter's President and Chief Operating Officer during the late 1960's, communicated with representatives of

---

**3.** Although Wm. Carter has contended in its post-trial submissions that it started selling children's playwear "at least as early as 1950" (Def. Post-Trial Proposed Findings of Fact ¶ 34), it submitted no evidence of any such sales prior to 1950. (See id. ¶¶ 34, 35, 36; PX 251, 252).

**4.** Of course, the CARTER'S mark is much stronger for infantwear, layettes, sleepwear, and underwear than it is for toddlers' clothing and playwear. A marketing study prepared by Wm. Carter in 1988 showed "top of the mind association," or unaided awareness, of the Wm. Carter brand of: 43% for baby clothes/layettes, 36% for pajamas/sleepwear, and 27% for underwear. The percentages were substantially lower, however, for toddlers clothes (1%), overalls/coveralls (no percentage listed), playclothes/playwear (1%), pants/jeans (1%), and matching shirts/polo shirts (no percentage listed). (PX 299).

Likewise, a 1993 survey noted that Wm. Carter was not as strong in toddlers' and children's playwear as it was in sleepwear and infants' playwear. It concluded that Wm. Carter was "more associated" with "soft fabric," while a more successful playwear company emphasized "durability." The survey showed that mothers purchased Wm. Carter playwear within the prior year for their own children as follows: 18% for infants, 5% for toddlers, and 3% for children. (DX Y–5).

**5.** (See, e.g., Tr. at 734–36, 762, 762, 816–17, 865–68; Griffin Dep. at 20–22; Holland Dep. at 30–31; Reynolds Dep. at 17–18, 27; Steinberg Dep. at 26–27; Van Coesant Dep. 8–9, 35–37; Mauch Dep. at 18–20, 22–25).

**800**

Wm. Carter when the latter twice wrote letters complaining of trademark infringement. Penfield responded both times by denying that H.W. Carter had engaged in any infringement and forwarding historical information showing use of its name and trademark. Wm. Carter did not pursue the matter on either occasion. (Penfield Dep. at 24–31).

The issue of the competing use of the Carter's name did not surface again until 1989. Robert Matura, Wm. Carter's then-President and Chief Executive Officer, requested an investigation into the activities of H.W. Carter. A trademark search was conducted and information was also obtained about H.W. Carter's business.

Between December 1989 and May 1990, there was an exchange of letters between H.W. Carter and Wm. Carter. (PX 236, 237, 238, 239, 240). Wm. Carter's attorneys initiated the series of correspondence, expressing its concern over H.W. Carter's use of the mark CARTER'S WATCH THE WEAR, and in particular, whether H.W. Carter would be "expand[ing] its mass marketing efforts to include [children's wear] under the CARTER'S WATCH THE WEAR mark." (PX 236).

Counsel for H.W. Carter responded in part as follows:

[H.W. Carter has] continuously manufactured and sold the goods recited in [the 1930] registration, namely, overalls, pants, coats, jackets and aprons....

With passage of time, such goods have been made in children's sizes for reasons of practicality, and our client's predecessor has continuously marketed goods in such sizes albeit through trade channels other than those normally employed by [Wm. Carter].... Our client has no intention of going into children's wear generally using the subject mark....

It should also be mentioned that our client does not contemplate any substantial change in the use of the mark....

(PX 237).

In subsequent correspondence, H.W. Carter's counsel noted that "CARTER'S and Carter's WATCH THE WEAR have very likely been sold in the same stores throughout the country...." (PX 239). He reiterated that H.W. Carter intended to continue marketing "utilitarian type clothing for children ..., whether ... called 'work wear' or something else," under the WATCH THE WEAR mark. (Id.). Annexed to the letter were materials showing that H.W. Carter had sold, in boys, girls, toddler, and infant sizes, dungarees, overalls, shortalls, pants, and "workwear." (Id.). One infants' price list showed, for example, printed rainbow overalls in pastel, and a "kidstuff only" price list showed raw cord and print cord dungarees in colors such as teal, grape, raspberry, bright heart, pastel rainbow, and bright rainbow.

No further action was taken until January 1993, when Wm. Carter's counsel wrote another letter. (PX 242). That letter specifically complained about the use, on a CARTER'S WATCH THE WEAR boys' parka sold by J.C. Penney's, of a hangtag that used only the mark CARTER'S. Wm. Carter's counsel wrote:

Obviously, our concern is that the use of the mark CARTER'S rather than CARTER'S WATCH THE WEAR on the hangtag may increase the likelihood of confusion in the marketplace as to the source of the boys' outerwear, and may mislead consumers and the trade into believing that the garment comes from the same source as the children's apparel sold by [Wm. Carter] under the well-known CARTER'S mark.

(PX 242). Counsel requested assurance that H.W. Carter cease use of the mark CARTER'S "in any form other than in the format of the registered CARTER'S WATCH THE WEAR mark, or, as applied to the specified wearing apparel." (Id.).

Counsel for H.W. Carter responded that the hangtag in question was "not newly manufactured," but was part of an existing inventory that would be "phased out." (PX 243). The letter stated that "[n]o attempt to create confusion with [Wm. Carter]'s products has been made." (Id.). As a result of this correspondence, H.W. Carter understood that Wm. Carter did not object to its use of CARTER'S WATCH THE WEAR in sales

to J.C. Penney's, at least with respect to boys' outerwear. (Tr. at 205–06).

The issue of the competing use of the CARTER'S name did not surface again until the events leading to this lawsuit.

### D. *AME and the "Launch"*

In 1994, H.W. Carter granted a license to AME to use its mark CARTER'S WATCH THE WEAR in the sale of certain children's clothing:

> Boys' workwear; namely, tops, bottoms and overalls made of flannel, denim, cotton, ducks, twills, canvas and corduroy; T-shirts; outerwear of all fabrications; all the foregoing in boys' sizes 2 to 20.

(PX 200, at 14).[6]

In early 1995, AME launched a line of boys' clothing under the mark CARTER'S WATCH THE WEAR. The line included jeans, overalls, shortalls, and shirts, made primarily from denim and flannel-type fabrics. The new line, however, also contained non-denim, non-flannel items such as rugby and other shirts. (DX N–3(iii)).

In February 1995, AME ran a two-page advertisement in *Children's Business*, a trade journal that covers the children's apparel and toy business, announcing:

> American Marketing Enterprises introduces H.W. Carter & Sons' new line of fashion denim, related separates and outerwear for boys.

(DX F–1). The advertisement featured a pair of boys' denim overalls and also prominently displayed the CARTER'S WATCH THE WEAR label. AME also used a one-page version of the advertisement, which touted "135 years of H.W. Carter & Sons' know-how." (DX F–2).

### E. *Wm. Carter's Response to the Launch*

At approximately the same time that AME was preparing its launch of the new line of boys' fashion denim, Wm. Carter was also making plans to rely more heavily on denim in its children's clothing.

Wm. Carter had suffered "significant losses, big, big losses," in the 1980's. (Tr. at 595). Consequently, in 1992, a new management team was installed at Wm. Carter. Frederic J. Rowan II, the former Chief Executive Officer of Lee Apparel Company (a major seller of jeans and other denim clothing), took over as President and Chief Executive Officer of Wm. Carter. Other former Lee executives joined him. Rowan wanted to turn things around by, among other things, introducing more "woven" fabrics into Wm. Carter's products, which historically had relied heavily on knitted fabrics. (Rowan Dep. at 25–28, 31–33). Denim is a woven fabric. (Mauch Dep. at 65). Rowan also wanted to see Wm. Carter "break into" the J.C. Penney chain (Tr. at 658; *see also* Pacifico Dep. at 63–64), where H.W. Carter had been selling its products for several years. (*See, e.g.*, PX 146–49, 164–66).

Rowan's desire to rely more heavily on woven fabrics was implemented in Wm. Carter's fall 1995 playwear line. (PX 273). In part because of a "renewed interest in railroads" and a "[b]ack-to-basics, back-to-nature" trend, Wm. Carter felt it had to have more denim in its playwear. (Rowan Dep. at 32–33). A prominent children's apparel journal observed in March 1995 that "[d]enim, a relatively untapped playwear resource in the past few [Wm.] Carter's collections, returns for fall with the conductor-inspired pinstripes of 'Railroad' and the ruffled, romantic dresses of 'Harvest.' " (DX B–7).

It was in this context that Rowan learned of AME's launch. Wm. Carter's attorneys contacted H.W. Carter's attorneys almost immediately. (PX 275). AME arranged for Wm. Carter's representatives to see the new line. On February 16, 1995, Wm. Carter's attorneys wrote to plaintiffs' attorneys, asserting that "the New Line constitutes a clear and serious infringement of the valuable trademark rights of [Wm. Carter]."

---

**6.** In January 1995, the license agreement was amended to also include:

> Girls work wear, namely, jeans, skirts, shirts, shorts, dresses, vests, overalls, jumpsuits, T-shirts, jumpers, cover-alls, sweatshirts, basic/novelty skirt-alls, blouses, fleece pants, basic/novelty short-alls, sweaters made of flannel, denim, cotton, ducks, twills, canvas and corduroy; outerwear of all fabrications; all the foregoing in girls' sizes 2 to 14.

(PX 201).

(PX 245). The letter further stated that "[i]f a resolution is not possible, [Wm. Carter] will have no choice but to commence trademark infringement litigation and seek an expedited hearing for an injunction." (*Id.*). The letter further stated:

> With the launch of the New Line, your clients have moved directly into the core business area of Carter's, and acted contrary to the written representations that H.W. Carter would not launch a line of children's clothes. If this activity is permitted to continue, Carter's will lose control over its marks and its goodwill.

(*Id.*). Counsel requested that the new line be withdrawn, that plaintiffs change the mark for the new line from CARTER'S WATCH THE WEAR to WATCH THE WEAR, and that plaintiffs change the identification of the source of the new line from H.W. Carter to AME. (*Id.*).

Plaintiffs responded to the letter by filing this lawsuit on February 22, 1995. The next day, Wm. Carter filed its counterclaims. Immediately thereafter, Rowan sent a letter to approximately three dozen of Wm. Carter's retail customers, including J.C. Penney, Sears, and other major department store chains, alleging that AME was marketing "infant and toddler denim playwear" under the name H.W. Carter, "using a label purchased from a bankruptcy trustee," in "blatant infringement" of Wm. Carter's trademark CARTER'S. The letter further stated that Wm. Carter "has sued [AME] and its partners for trademark infringement, unfair competition and damages." (PX 248; *see also* PX 249).

### DISCUSSION AND CONCLUSIONS OF LAW

#### A. The Trademark Claims

The principal issue presented is whether plaintiffs' use of the trademark CARTER'S WATCH THE WEAR in their new line of boys' clothing violates Wm. Carter's rights to its trademark CARTER'S. I hold that it does not.

7. Defendant argues that there is no separate category of children's clothing called "workwear."

■ It is a fundamental principle of trademark law that

> the right to exclusive use of a trademark derives from its appropriation and subsequent use in the marketplace. The user who first appropriates the mark obtains an enforceable right to exclude others from using it, as long as the initial appropriation and use are accompanied by an intention to continue exploiting the mark commercially.

*La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1271 (2d Cir.1974) (citing cases). *Accord Dial–A–Mattress Operating Corp. v. Mattress Madness, Inc.*, 841 F.Supp. 1339, 1347 (E.D.N.Y. 1994) ("The first user who continuously uses an inherently distinctive service mark in the relevant market is the senior user and has priority over any second comers."); *Major League Baseball Properties, Inc. v. Sed Non Olet Denarius, Ltd.*, 817 F.Supp. 1103, 1133 (S.D.N.Y.1993) (" 'In the ordinary case of parties competing under the same mark in the same market, it is correct to say that prior appropriation settles the question.' ") (*quoting Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 415, 36 S.Ct. 357, 361, 60 L.Ed. 713 (1916)), *vacated pursuant to settlement*, 859 F.Supp. 80 (S.D.N.Y.1994); *Talk To Me Products, Inc. v. Larami Corp.*, 804 F.Supp. 555, 559 (S.D.N.Y.1992) ("The exclusive right to a distinctive mark belongs to the one who first uses it in connection with a particular line of business."), *aff'd*, 992 F.2d 469 (2d Cir.1993).

■ Here, H.W. Carter was the first user of the CARTER'S name in connection with the sale of children's outerwear, overalls, denim products, and what is aptly described as "workwear." [7] Moreover, since 1930 it has continuously used the mark CARTER'S WATCH THE WEAR in connection with children's outerwear, overalls, denim products, and "workwear." On the other hand, Wm. Carter did not begin using CARTER'S in the sale of children's clothing—other than undergarments, sleepwear, and layettes—until the 1950's. It did not sell any denim products until the 1970's.

I disagree. (*See, e.g.,* PX 12, 13, 16, 29, 191, 192).

In addition, the mark CARTER'S WATCH THE WEAR was registered in 1930, has been renewed, and remains valid today. As defendant notes in discussing the registration of its own marks, federal registration " 'creates a strong presumption of the validity of the mark,' and of the registrant's exclusive right to use the mark on the goods or services specified in the registration." (Def. Post–Trial Mem. at 13) (*quoting American Home Prods. Corp. v. Johnson Chem. Co.,* 589 F.2d 103, 106 (2d Cir.1978)). Defendant also concedes that plaintiffs' mark CARTER'S WATCH THE WEAR is "incontestable." (*See* Def. Post–Trial Mem. at 25). Hence, H.W. Carter's registration is "conclusive evidence" of its right to use the registered mark in commerce on or in connection with the specified goods. 15 U.S.C. § 1115(b).

Defendant argues, however, that the incontestability of the 1930 mark is irrelevant because the registration was limited to five specific categories of clothes—overalls, pants, coats, jackets, and aprons—and made no reference to children's apparel. (Def. Post–Trial Mem. at 22). Hence, defendant argues, it did not cover children's clothing.

Defendant's argument is rejected. The most reasonable reading of the 1930 registration is that, precisely because it contained no limitations as to size, age, gender, or intended purpose, it covered the items of clothing in question without regard to size, gender, age, or intended purpose. If the intent had been to limit the registration to adult sizes, presumably the words "adult," "men's," or "women's" would have been included. *See, e.g., American Hygiene Laboratories Inc. v. Tiffany & Co.,* 12 U.S.P.Q.2d 1979, 1983 (T.T.A.B.1989) ("because there is no restriction in the [registration] application with respect to channels of trade, we must presume that applicant's goods are sold in all channels of trade normal for those products"); *GTE Auto. Elec. Inc. v. Merit Int'l Corp.,* 196 U.S.P.Q. 263, 265 (T.T.A.B.1977) ("where there is no limitation in an application or registration as to trade channels or classes of purchasers, it must be presumed that the goods described therein are suitable for any and all purposes for which they are generally

employed, that they move through all channels of trade peculiar to such goods, and are sold to all potential users of such goods"); *Caldwell Lace Leather Co. v. Western Filament, Inc.,* 173 U.S.P.Q. 695, 698 (T.T.A.B. 1975) ("in the absence of any limitation therein as to the nature and use of the shoe laces, we must assume that the term 'shoe laces' encompasses shoe laces used for all types of shoes including work shoes, boots, and moccasins of the type for which opposer's shoe laces are primarily intended, as well as dress shoes").

In contrast, Wm. Carter's earlier registrations were limited. The 1907 registration referred to "certain underclothing." (PX 282). The 1922 registration referred to, among other things, "undergarments . . . for children; athletic suits, woven athletic shirts, woven athletic drawers, woven athletic trunks for boys; woven camisoles, bloomers, for girls, and knitted shirts for children." (PX 283). While the references to athletic suits, athletic shirts, and knitted shirts may very well cover more than underwear, these references cannot be fairly read to extend to playwear generally or to "workwear" items such as overalls and denim products.

Wm. Carter's 1979 registration, of course, is much broader. It covered "clothing for infants and children," and gave as examples "underwear, swimwear, shirts, blouses, dresses, skirts, pants, slacks, shorts, coveralls, creepers, overalls, jackets, vests, [and] sleepwear," among others. (DX Q–1). The 1979 registration, however, came nearly half a century after H.W. Carter's 1930 registration, and it came after H.W. Carter had been selling children's overalls, outerwear, and other denim products for decades.

Accordingly, on the basis of its continuous and substantial use of the mark CARTER'S WATCH THE WEAR since 1930, I hold that H.W. Carter is the senior user of the mark CARTER'S in the sale of children's overalls, pants, coats, jackets, and other "workwear," which includes playwear made from denim products.

The conclusion that H.W. Carter ought not to be enjoined from using the mark CARTER'S WATCH THE WEAR in the manner indicated is supported not just by the se-

quence of events in this case but also by a balancing of the policy interests underlying the law of trademarks:

> Since an unfair competition suit involves the public's interest in protection against deceit as to the sources of its purchases, the businessman's right to enjoy business earned through investment in the good will and reputation attached to a trade name, and the interest of others in not being restrained from free use of trade names because of mere token use on the part of one, ... the Court is called upon in such a suit to balance these equities and interests....

*National Color Labs., Inc. v. Philip's Foto Co.*, 273 F.Supp. 1002, 1004 (S.D.N.Y.1967) (citations omitted); *see generally* 1 J. Thomas McCarthy, *Trademarks & Unfair Competition* § 2.01 (3d ed. 1995).

Here, plaintiffs certainly did not engage in deceit, for in my view—and I so find—they were not trying to take advantage of any confusion between Wm. Carter's CARTER'S and H.W. Carter's CARTER'S WATCH THE WEAR. To the contrary, plaintiffs were clearly proud of the H.W. Carter heritage, and the new line featured the H.W. Carter name prominently and touted "135 years of H.W. Carter & Sons' know-how." (DX F–2). Plaintiffs were not seeking to engender, or take advantage of, any confusion on the part of consumers. Moreover, although Wm. Carter certainly worked hard over the years to earn its well-deserved reputation, H.W. Carter worked hard as well developing its own good will and reputation. Indeed, this is not a situation involving the "token use" of a trade name; rather, H.W. Carter has labored for many years, and it has a substantial interest in not being restrained from using CARTER'S WATCH THE WEAR in the market in which it has conducted business since before 1930.

In light of my decision on the issue of priority, I need not reach the issue of likelihood of confusion. Even assuming there is a likelihood of confusion, that confusion is not a basis for enjoining the senior user from using its own mark. Indeed, this is not a case where the senior user of a mark is seeking to prevent a junior user from infringing on the mark. Rather, the senior user has sued simply for a declaration that it was the senior user and that it had the right to use its own mark.

Likewise, I need not reach plaintiffs' laches, acquiescence, and estoppel arguments. In balancing the equities, however, it is worth noting that Wm. Carter was aware of H.W. Carter's use of the CARTER'S name in the sale of certain types of children's clothing for many years and chose not to act on that knowledge. In particular, the exchange of correspondence in 1989 and 1990 certainly suggests that Wm. Carter acquiesced to H.W. Carter's use of CARTER'S WATCH THE WEAR in the sale of "utilitarian type clothing for children ..., whether ... called 'work wear' or something else." Moreover, the 1993 correspondence further confirmed to H.W. Carter that Wm. Carter was concerned not about H.W. Carter's use of the mark CARTER'S WATCH THE WEAR, but of the use of the name CARTER'S alone.

Judgment will be entered in favor of plaintiffs' on the trademark infringement claims.

### B. *The Letter To The Trade*

■ Plaintiffs also have asserted a claim under the Lanham Act based on Wm. Carter's letter to the trade, which was circulated to several dozen customers after the commencement of this litigation. Plaintiffs contend that the letter was false and misleading in "tone and content" and in the following specific respects: (1) the letter stated that AME was selling infants' clothing; (2) it stated that AME had purchased a label from a bankruptcy trustee; (3) it omitted the fact that H.W. Carter owned an incontestable trademark registration; and (4) it omitted the fact that plaintiffs had initiated suit against Wm. Carter. (PX 248).

Section 43(a) of the Lanham Act provides in pertinent part:

> Any person who, on or in connection with any goods or services, ... uses in commerce any ... false or misleading representation of fact, which ... in commercial advertising or promotion, misrepresents the nature, characteristics, [or] qualities ... of his or her or another person's

goods, services, or commercial activities, shall be liable in a civil action. . . .

15 U.S.C. § 1125(a)(1)(B).

While I agree that the letter was misleading in certain respects, I find that plaintiffs have not met their burden of proving that Wm. Carter's distribution of the letter constitutes a violation of the Lanham Act. First, although the statement that AME was marketing "infant" playwear under the name H.W. Carter was wrong, this was not a material misstatement, particularly in view of the statement in the January 1995 issue of *Children's Business* that H.W. Carter had granted AME the right to manufacture and market "children's sizes 12 months through 20 denim separates." (DX G–1). Second, the letter did not state that AME had purchased the label from a bankruptcy trustee; it stated that AME was "using a label purchased from a bankruptcy trustee." That fact was correct, as Moskowitz had purchased the assets of H.W. Carter from a bankruptcy trustee in 1987. Third, I do not believe there was an obligation on Wm. Carter's part to concede or disclose in the letter that H.W. Carter had an incontestable registration to CARTER'S WATCH THE WEAR. Finally, although the statement that "[Wm.] Carter's has sued [AME] and its partners for trademark infringement" was misleading (since AME and H.W. Carter had actually initiated the suit, with Wm. Carter filing counterclaims), the statement was at least arguably technically true.

The overall thrust of the letter was that Wm. Carter believed AME and "its partners" were infringing on its trademarks, that Wm. Carter had taken legal action to protect its trademarks, and that Wm. Carter was confident that it would prevail. Simply put, the overall thrust of the letter was not objectionable.

In this context, the misleading aspects of the letter are not material. *See Mobius Mgt. Systems, Inc. v. Fourth Dimension Software, Inc.*, 880 F.Supp. 1005, 1019 (S.D.N.Y.1994) (to establish claim under section 43(a) of Lanham Act, plaintiff must show "material misrepresentations"). The inclusion of the reference to "infant" playwear, the failure to mention that plaintiffs had brought suit first, and the reference to Wm. Carter "su[ing]"

rather than "counter-suing" do not change the overall thrust of the letter.

Ultimately, while I am surprised that a company that prides itself on a name, in the words of the letter, "known for quality and excellence and trusted by mothers for over 125 years," would stoop to such tactics, these misstatements and omissions do not rise to a level of a violation of the Lanham Act.

## CONCLUSION

Judgment will be entered in favor of plaintiffs on their trademark infringement claims. Their use of the mark CARTER'S WATCH THE WEAR in the manufacture, advertisement, promotion and sale of children's overalls, pants, coats, jackets, and "workwear," including the clothing featured in AME's new line, does not infringe any trademark of defendant or otherwise compete unfairly with defendant.

Judgment will be entered in favor of plaintiff dismissing defendant's counterclaims.

Judgment will be entered in favor of defendant dismissing plaintiffs' claims based on the letter to the trade.

Plaintiffs' request for attorneys' fees pursuant to 15 U.S.C. § 1117 is denied, for I find that this is not an "exceptional case." Attorneys' fees may be awarded in trademark infringement cases where a party acted in bad faith, *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1543 (2d Cir.), *cert. denied*, 506 U.S. 991, 113 S.Ct. 510, 121 L.Ed.2d 445 (1992), or "willfully, intentionally and with a callous and reckless disregard" for the plaintiffs' rights, *Getty Petroleum Corp. v. Bartco Petroleum Corp.*, 858 F.2d 103, 113–14 (2d Cir.1988), *cert. denied*, 490 U.S. 1006, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989), or "malicious[ly], fraudulent[ly], deliberate[ly] or willful[ly]." *Schieffelin & Co. v. Jack Co.*, 850 F.Supp. 232, 253 (S.D.N.Y. 1994). This is not such a case.

Plaintiffs are awarded, however, their reasonable costs in prosecuting this lawsuit.

SO ORDERED.