**SMART STYLE INDUSTRIES, INC. and H.W. Carter & Sons, Inc., Plaintiffs,**

v.

**PENNSYLVANIA GENERAL INSURANCE COMPANY, Defendant.**

No. 95 Civ. 10095 (DC).

United States District Court, S.D. New York.

July 10, 1996.

8. Copies of the agreements are annexed to the affidavit of Regina Tait.

Douglas C. Fairhurst, New York City, for Plaintiffs.

Curtis, Zaklukiewicz, Vasile, Devine & McElhenny by Brian W. McElhenny, Merrick, New York, for Defendant.

## OPINION

CHIN, District Judge.

In this diversity action, plaintiffs Smart Style Industries, Inc. ("Smart Style") and H.W. Carter & Sons, Inc. ("H.W. Carter") seek reimbursement of legal fees incurred during an underlying trademark action, *H.W. Carter & Sons, Inc. and American Marketing Enterprises Inc. v. The William Carter Co.*, 913 F.Supp. 796 (S.D.N.Y.1996) (Chin,

J.) (the "Underlying Action"), pursuant to an insurance policy issued by defendant Pennsylvania General Insurance Company ("Penn General"). Plaintiffs have moved for judgment on the pleadings under Fed.R.Civ.P. 12(c) or, in the alternative, for summary judgment under Fed.R.Civ.P. 56. Penn General has cross-moved for summary judgment under Fed.R.Civ.P. 56.

H.W. Carter was the principal plaintiff in the Underlying Action, which involved trademark claims raised by both sides and a Lanham Act claim asserted by H.W. Carter.[1] Nevertheless, plaintiffs argue, and Penn General concedes, that some aspects of the Underlying Action placed H.W. Carter in a defensive posture and thus at some point Penn General's duty to defend was triggered. Thus, I must determine when the duty to defend was triggered and which aspects of the Underlying Action placed H.W. Carter in a defensive posture. As discussed more fully below, Penn General's duty to defend arose when H.W. Carter submitted notice of the Underlying Action. Also, the trademark claims, but not the Lanham Act claim, placed H.W. Carter in a defensive posture. Thus, Penn General is liable for attorneys' fees incurred after March 6, 1995 relating to the trademark claims raised in the Underlying Action.

### BACKGROUND

The relevant facts are undisputed. In October 1994, Penn General issued a Commercial General Liability policy (the "Policy") to Smart Style; H.W. Carter is named as an additional insured under the policy. Among the coverages provided by the Policy is coverage for "Personal and Advertising Injury Liability." Under this provision, Penn General was required to defend any suit against plaintiffs seeking damages for advertising injury. Under the terms of the Policy, advertising injury includes copyright and trademark infringement. The Policy also contains a condition to coverage providing that "[n]o insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent."

In early 1995, American Marketing Enterprises ("AME") and H.W. Carter launched a line of boys' clothing under the mark "CARTER'S WATCH THE WEAR." *H.W. Carter & Sons, Inc.*, 913 F.Supp. at 801. In response, attorneys for The William Carter Company ("Wm. Carter") wrote a letter to H.W. Carter's attorneys, contending that H.W. Carter had infringed on Wm. Carter's trademark "CARTER'S." The letter stated that Wm. Carter would commence a trademark infringement suit if H.W. Carter did not cease its use of the purportedly infringing trademark. *Id.* at 801–02.

On February 22, 1995, with controversy brewing over the use of their competing trademarks, H.W. Carter (and AME) commenced an action against Wm. Carter, seeking a declaration that H.W. Carter's trademark did not infringe on Wm. Carter's trademark. The next day, Wm. Carter asserted its counterclaims. Thus, even though H.W. Carter was the nominal plaintiff, the principal issue presented in the Underlying Action was whether H.W. Carter's use of its trademark violated Wm. Carter's rights to its trademark. *Id.* at 802.

After asserting its counterclaims, Wm. Carter sent a letter to several of its customers, alleging that H.W. Carter was infringing on its trademark. The letter also stated that Wm. Carter "has sued [AME] and its partners for trademark infringement, unfair competition and damages." *Id.* In response, on April 14, 1995, H.W. Carter amended its complaint to assert a claim under the Lanham Act, seeking damages for purportedly false and misleading statements contained in the letter.

---

1. H.W. Carter's complaint sought a declaratory judgment that its use of the trademark "Carter's Watch the Wear" did not infringe on Wm. Carter's trademark "Carter's." Wm. Carter's counterclaims included a claim that H.W. Carter's work infringed on Wm. Carter's trademark rights as well as claims for false designation of origin, misappropriation, and unfair competition, all of which were based on the facts that formed the basis of the trademark claims. I will refer to all these claims collectively as the trademark claims. Later, H.W. Carter amended its complaint to assert a claim under the Lanham Act based on a letter that Wm. Carter sent to the trade after the filing of its counterclaims. I will refer to this claim as the Lanham Act claim.

In February 1995, Townley & Updike began representing H.W. Carter in its conflict with Wm. Carter. That relationship was formalized on March 6, 1995 when H.W. Carter's president, Norman Moskowitz, executed a retainer agreement with Townley & Updike. Although the letter outlining the terms of the retainer was not sent to Penn General, written notice of the claim against H.W. Carter was sent to the General Accident Insurance Co. ("General Accident"), an agent for Penn General, on or about March 6, 1995.

On April 5, 1995, H.W. Carter's general counsel, Stephen Selden, wrote General Accident to follow-up on the March 6, 1995 notice of claim letter. Selden characterized the letter as "[his] tender of [his] client's request for defense of the counterclaim" to Penn General. Selden noted that H.W. Carter had retained Townley & Updike to commence the declaratory judgment action and continued to retain Townley & Updike, because Penn General had not responded to the notice of claim letter. Finally, Selden requested that Townley & Updike remain as H.W. Carter's counsel, because it had already accumulated knowledge of the lawsuit.

On May 5, 1995, General Accident responded to H.W. Carter's request by agreeing "to take over the defense of the counterclaim" in the Underlying Action.[2] On May 12, 1995, General Accident agreed to allow Townley & Updike to remain as H.W. Carter's counsel. After a bench trial, I concluded that H.W. Carter's use of its mark did not infringe on Wm. Carter's trademarks. *Id.* at 804. I also rejected the Lanham Act claim based on the trade letter. *Id.* at 805.

Penn General concedes liability for legal fees incurred after May 5, 1995 in defending the counterclaims asserted in the Underlying Action. It contests liability, however, for any attorneys' fees incurred before May 5, 1995 and for attorneys' fees incurred after that date that relate to H.W. Carter's role as plaintiff in the Underlying Action. Conversely, H.W. Carter contends that Penn General is liable for all attorneys' fees that were incurred during the Underlying Action.

Thus, three issues exist, all of which can be decided as a matter of law: (1) when did Penn General's duty to defend begin, thereby giving rise to its obligation to pay for attorneys' fees, (2) whether Penn General is responsible for attorneys' fees stemming from H.W. Carter's affirmative claims for declaratory relief, and (3) whether Penn General is responsible for attorneys' fees stemming from H.W. Carter's Lanham Act claim.

## DISCUSSION

### A. *Applicable Legal Standards*

The standards applicable to motions for summary judgment are well-settled. A court may grant summary judgment only where there is no genuine issue of material fact and the moving party is therefore entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c). Accordingly, the court's task is not to "weigh the evidence and determine the truth of the matter but [to] determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

■ Under New York law, insurers have a broad obligation to defend and may not relieve themselves of that duty unless there is no possible factual or legal basis that would bring the action within the purview of the insurance policy. *See City of Johnstown, New York v. Bankers Standard Insurance Co.,* 877 F.2d 1146, 1149 (2d Cir.1989); *Seaboard Surety Co. v. Gillette Co.,* 64 N.Y.2d 304, 486 N.Y.S.2d 873, 876, 476 N.E.2d 272, 275 (1984). Thus, an insurer is required to provide a defense to any action that falls within the policy coverage, even if that action is meritless. *Avondale Industries, Inc. v. Travelers Indemnity Company,* 123 F.R.D. 80, 82 (S.D.N.Y.1988), *aff'd,* 887 F.2d 1200 (2d Cir.1989), *cert. denied,* 496 U.S. 906, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990). In addition, an insurer must defend an entire action even if only one claim potentially falls within the indemnity coverage of the policy. *Sea-*

**2.** General Accident accepted its duty to defend under a reservation of rights that is inapplicable in this action. The May 5, 1995 letter was silent with respect to fees and costs incurred prior thereto.

*board Surety Co.*, 486 N.Y.S.2d at 876, 476 N.E.2d 272.

## B. *The Duty to Defend*

In New York, the duty to defend is triggered by the filing of a complaint containing allegations that could possibly bring the action within the scope of coverage provided by the insurance policy.[3] *Goldberg v. Lumber Mut. Cas. Ins. Co.*, 297 N.Y. 148, 154, 77 N.E.2d 131 (1948) (insurer's duty to defend "came into being from the allegations in the negligence action that the injury was within coverage of the policy"); *Recant v. Harwood,* — A.D.2d ——, 635 N.Y.S.2d 231, 232 (1st Dep't 1995) (" 'the duty to defend is triggered if facts alleged in the complaint fall within the scope of coverage' ") (*quoting New Hampshire Ins. Co. v. Jefferson Ins. Co.*, 213 A.D.2d 325, 624 N.Y.S.2d 392 (1st Dep't 1995)); *see also Sucrest Corp. v. Fisher Governor Co.*, 83 Misc.2d 394, 371 N.Y.S.2d 927, 934 (Sup.Ct. N.Y. County 1975) ("In determining whether there is a duty to defend, the point of departure is the allegations of the complaint. . . ."). Thus, "the insurer will be liable for defense costs from the time that the duty was triggered (*i.e.*, when a complaint alleging facts arguably entitling the insured to coverage is made). . . ." *Maryland Casualty Co. v. W.R. Grace & Co.*, No. 88 Civ. 4337 (JSM), 1994 WL 167962, at *5 (S.D.N.Y. Apr. 29, 1994); *see also Colonial Tanning Corp. v. Home Indemnity Co.*, 780 F.Supp. 906, 927 (N.D.N.Y.1991) (insurers obligated to indemnify insured for all defense costs that were useful in defending complaint regardless of date that complaint was filed).[4]

█ Here, Penn General concedes that the counterclaims asserted by Wm. Carter against H.W. Carter on February 23, 1995 were covered by the Policy. Penn General argues, however, that it is not responsible for any of Townley & Updike's charges incurred before May 5, 1995, when it agreed to take over the defense of the counterclaims. Relying on a clause in the Policy that provides that "[n]o insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent," Penn General contends that all costs incurred prior to the giving of its consent are not reimbursable. I agree, but only in part.

Although the parties have not cited any New York cases on point, courts in other jurisdictions have enforced so-called "voluntary payments" provisions identical to the one contained in the Policy. *See, e.g., Faust v. The Travelers*, 55 F.3d 471, 472 (9th Cir. 1995) ("California courts have consistently honored voluntary payment provisions"); *Michaud v. Merrimack Mut. Fire Ins. Co.*, Civ.A. No. 94–0175B, 1994 WL 774683, at *6– 7 (D.R.I. Nov. 16, 1994) (denying, on the basis of voluntary payments clause, defense costs that were voluntarily paid by plaintiff).[5] Indeed, the "voluntary payments" clause is a part of the Policy and it cannot be ignored. *See Caporino v. Travelers Ins. Co.*, 62 N.Y.2d 234, 476 N.Y.S.2d 519, 521, 465 N.E.2d 26, 27–28 (1984) (courts "may not disregard clear provisions which the insurers inserted in [an insurance policy] and the insured accepted"); *see also* Barry R. Ostrager & Thomas R. Newman, *Handbook on Insurance Coverage Disputes* § 1.01[a], at 4 (8th ed. 1995).

█ At the same time, a "voluntary payments" clause cannot literally be read as prohibiting an insured from incurring any expense without the explicit prior approval of the insurer. Rather, the clause must be construed according to the reasonable expectations of the insured. Ostrager & Newman,

---

3.  Courts in other jurisdictions have held that the duty to defend arises not merely upon the filing of a covered claim but upon "notice" of the claim, *see, e.g., Towne Realty, Inc. v. Zurich Ins. Co.*, 193 Wis.2d 544, 534 N.W.2d 886, 892 (1995), or when the insured "tenders" the defense, *i.e.*, specifically requests the insurer to defend the action, either formally or informally, *see, e.g., Fireman's Fund Ins. Cos. v. Ex–Cell–O Corp.*, 790 F.Supp. 1318, 1327 (E.D.Mich.1992).

4.  Of course, timely notice of a claim is a condition precedent to the duty to defend. *See, e.g., Holmes v. Morgan Guaranty and Trust Co.*, —— A.D.2d ——, 636 N.Y.S.2d 778, 779 (1st Dep't 1996). Penn General does not contend that H.W. Carter's notice in this case was untimely.

5.  A "voluntary payment" clause applies to attorneys' fees and defense costs. *Faust,* 55 F.3d at 473; *Crystal Geyser Water Co. v. American Motorists Ins. Co.*, No. C–94–1531, 1995 WL 590330, at *7 (N.D.Cal. Sept. 28, 1995).

*supra,* § 1.03[b], at 18, 24. Implicit in the duty to defend, for example, is the duty to respond to a complaint against an insured on a timely basis. To allow an insurer to dictate the date when the duty to defend commences would defeat, to a large degree, the purpose of the duty to defend. In addition, in New York, the duty to defend provides broad protection to policyholders for all defense costs incurred where a complaint arguably falls within the scope of a policy. *Seaboard Surety Co.,* 486 · N.Y.S.2d at 876. Hence, once consent is given, the scope of that consent must be reasonably construed to encompass all reasonable expenses ordinarily incurred in the usual course of a litigation. Likewise, consent cannot be unreasonably withheld, and once the duty to defend is triggered, it would be unreasonable for an insurer to withhold consent for reasonable expenses incurred after notice was given, merely because consent had not yet been granted when those reasonable expenses were incurred. Accordingly, Penn General's argument that coverage is not triggered, where a policy contains a "voluntary payments" clause, until an insurer actually gives its consent is rejected.

I also reject, however, plaintiffs' contention that coverage commenced upon the filing of the counterclaims. H.W. Carter disregarded the "voluntary payments" provision of the Policy by retaining Townley & Updike before notifying Penn General of the trademark dispute or obtaining its consent. Indeed, H.W. Carter chose to commence an action against Wm. Carter rather than wait to be sued. Under these circumstances, therefore, H.W. Carter's *initial* actions certainly were voluntary. Although Wm. Carter's counterclaims were filed the day after H.W. Carter filed its complaint, arguably putting H.W. Carter in a defensive posture as early as the day after it filed its complaint, nonetheless H.W. Carter initiated the litigation. Penn General had no opportunity to control the litigation or to influence the litigation strategy, as it had not been placed on notice of the lawsuit. It had no opportunity to be heard on the significant question of whether H.W. Carter should sue for declaratory relief or wait to be sued. *See Michaud,* 1994 WL 774683, at *7.

Once H.W. Carter notified Penn General of the Underlying Action, however, Penn General was in a position to control or influence the litigation, and it was obligated at that point to provide a defense. Penn General could not avoid that obligation simply by delaying its consent and then relying on the voluntary payments provision of the Policy. Indeed, when Penn General did not provide its prompt consent, the payments to Townley & Updike were no longer voluntary, as H.W. Carter had to proceed with its defense of the trademark claims. Moreover, when Penn General did consent on May 5, 1995, it did not object to any of the prior expenses, and a week later it consented to the continued use of Townley & Updike. The only reasonable construction of the scope of the consent is that it extended back to the date Penn General was given notice. Accordingly, H.W. Carter is entitled to recover attorneys' fees incurred, subject to the limitations discussed below, after March 6, 1995—the date that it notified Penn General of the Underlying Action. *See Michaud,* 1994 WL 774683, at *7 (insurer liable for attorney's fees from date that it first had knowledge of underlying action).

### C. *The Claims for Declaratory Relief*

As to fees and costs incurred after its duty to defend arose, Penn General seeks to distinguish between costs incurred by H.W. Carter in defending against the counterclaims and costs incurred in prosecuting its affirmative claims for declaratory relief. The purported distinction is not meaningful.

Although H.W. Carter was nominally a plaintiff in the Underlying Action, its role was defensive; it brought the action as a preemptive strike only after Wm. Carter had threatened to sue for trademark infringement. Moreover, H.W. Carter's filing of its complaint promptly drew the filing of Wm. Carter's counterclaims in response. H.W. Carter's claims for declaratory relief and Wm. Carter's counterclaims both concerned a single issue: whether H.W. Carter's trademark infringed on Wm. Carter's trademark. In other words, the action concerned H.W. Carter's *defense* of its trademark. The costs incurred in "defending" Wm. Carter's coun-

terclaims are inseparable from the fees incurred in "prosecuting" its claims for declaratory relief. Indeed, all actions taken by H.W. Carter in pursuit of its claims for declaratory relief were necessary to its defense of the counterclaims. Thus, there is no basis for awarding H.W. Carter only those fees incurred in "defending" the counterclaims.

The parties have not cited any case under New York law on the issue of insurance coverage for "defense" costs where an insured brought a preemptive suit in the underlying action seeking a declaration that it has not engaged in wrongdoing. The parties have cited cases, however, where insureds were held to be entitled to costs associated with the filing of third-party claims that were related to the covered primary action. *E.g., Sucrest Corp.,* 371 N.Y.S.2d at 936 (defense costs in underlying action included costs for insured's third-party complaint); *Regis Radio Corp. v. American Employers Ins. Co.,* 30 Misc.2d 341, 214 N.Y.S.2d 976, 980 (Sup. Ct. N.Y. County 1961) (insurer liable for all defense costs when "gravamen" of underlying action involved covered claim and insured's counsel was not required to perform "additional or different legal services" on uncovered claim). These cases support the conclusion that H.W. Carter is entitled to recover costs incurred in connection with its claims for declaratory relief that were or would have been incurred in any event in connection with its defense of the counterclaims. *Cf. Mighty Midgets, Inc. v. Centennial Ins. Co.,* 47 N.Y.2d 12, 416 N.Y.S.2d 559, 564, 389 N.E.2d 1080, 1084–85 (1979) (in coverage action, courts permit an insured to recover attorneys' fees incurred when it was cast in a defensive posture, as opposed to a situation where it initiated an action to settle its rights).

#### D. *The Lanham Act Claim*

■ Finally, Penn General contends that the Policy does not cover fees and costs incurred by H.W. Carter in processing its Lanham Act claim based on Wm. Carter's letter to the trade. I agree.

Unlike H.W. Carter's initial declaratory judgment claim and Wm. Carter's counterclaims, both of which placed H.W. Carter in a defensive posture, H.W. Carter initiated the Lanham Act aspect of the Underlying Action, seeking money damages. Indeed, H.W. Carter did not amend its complaint to add the Lanham Act claim until April 1995, almost two months after Wm. Carter asserted its counterclaims. Although H.W. Carter now argues that the Lanham Act claim was asserted as part of its overall defense strategy, in fact it was an affirmative claim for damages that was separate and distinct from the trademark infringement claims and involved different proof. Thus, H.W. Carter is not entitled to recover attorneys' fees incurred in prosecuting the Lanham Act claim in the Underlying Action.

#### CONCLUSION

For the foregoing reasons, the parties' motions for summary judgment are granted in part and denied in part. Plaintiffs are to submit by July 31, 1996 affidavits with supporting documentation detailing the attorneys' fees and costs incurred after March 6, 1995 in connection with all aspects of the Underlying Action, except with respect to the Lanham Act claim, for which they seek reimbursement under the Policy. Defendant may respond to plaintiffs' submissions on or before August 16, 1996.

SO ORDERED.